A. MARIA ODDY *vs.* WEST END STREET RAILWAY
COMPANY.

WILLIAM P. ODDY *vs.* SAME.

Suffolk.   December 11, 1900. — March 29, 1901.

Present: HOLMES, C. J., KNOWLTON, BARKER, HAMMOND, & LORING, JJ.

Street railway companies carrying passengers on ordinary public streets or high-
    ways are not negligent in not providing means for warning passengers about to
    leave a car of the danger of colliding with or being run over by other vehicles
    in the street.
A street railway car was stopped by the motorman between two stopping places
    on account of the approach at great speed of a fire engine and a hose cart.   A
    woman passenger who did not know of the alarm of fire and whose destination
    was the next stopping place, the name of which had been called by the con-
    ductor, proceeded to alight from the car and in doing so was struck by the
    hose cart and injured.   When the car began to lessen its speed the conductor,
    being on the rear platform, found that the fire apparatus was approaching.   He
    looked over the closed gate at the left of the platform and saw the engine
    pass on that side and continued to look in the same direction for the purpose of
    seeing when the hose cart would pass.   Almost immediately the hose cart passed
    on the other side where the passenger was alighting.   The conductor did not
    see the passenger as she came from the car to the platform nor until his atten-
    tion was called to the other side by the passing of the hose cart, when he saw
    her on the ground.   *Held,* that there was no evidence of negligence on the part
    of the street railway company.

TWO ACTIONS OF TORT, the first to recover for personal in-
juries sustained by the plaintiff, A. Maria Oddy, from being struck
by a hose cart while alighting from a car of the defendant, and
the second by the husband of said Maria to recover for the loss
of her services and society and expenses of medical attendance
on account of her injuries.   Writs dated July 16, 1897.

At the trial in the Superior Court, before *Blodgett*, J., the following facts appeared: The defendant is a common carrier of passengers, and operates a double track line of electric cars through Warren Street in that part of Boston called Roxbury. The cars run on the right hand track as they go. On January, 7, 1897, about eight o'clock in the evening, the plaintiff in the first case, a woman fifty-two years of age, at Dudley Street entered and became a passenger in one of the defendant's outward bound closed cars, called a Warren Street car, intending to ride to Lansing Street, a regular stopping place for that car. The words "right hand" and "left hand" refer to the direction in which the car was going, unless otherwise stated. The car stopped before it reached Lansing Street on account of the approach in front of a fire engine and a hose cart, and remained standing until they passed. The fire engine passed on the left hand side of the car and the hose cart on the right hand side of the car, between it and the curbstone. The plaintiff Maria arose, walked through the rear door of the car and on to the rear platform, and proceeded to alight from the right hand side of the rear platform. There was a gate upon the left hand side. She was struck by the hose cart, thrown to the ground and received the injuries complained of.

Maria Oddy testified in her own behalf, that on the evening of the accident she took a Warren Street car at the Dudley Street transfer station, intending to go to Maywood Street; but Lansing Street was the nearest regular stopping place for Maywood Street, and she intended to get off at Lansing Street. She sat on the left hand side of the car, three or four seats from the rear door. It was dark outside, and the car was lighted. A few seconds after passing Woodbine Street, which is the stopping place next before reaching Lansing Street, she saw the conductor on the rear platform looking into the car through the rear door, which was open, apparently looking in her direction. She raised her hand to signal him to stop. She did not take her eyes from him until she was satisfied he saw her. The car was moving at the usual rate. A few seconds later he called into the car "Lansing Street." She would say she did not open the rear door when she went out. She did not remember having opened it.

"The car seemed to stop in a few seconds after that. As the

car came to a stop, I rose from my seat and stepped towards the door.  At that time the car came to a full stop.  I stepped off of the platform, turned to the left, got down one step, and was making an attempt to get from the next step to the street, and that is all I remember. . . . I did not reach the ground, according to my best recollection."

She testified that she did not know that there was any engine or hose carriage coming in the street, and that she had not heard any or knew of any alarm of fire at the time; that she did hear the sound of a gong at that time, and thought it was a street car gong on a car coming in the opposite direction; that when she came out, she looked right straight ahead of her and did not remember that she looked to the right or left, saying, " I don't know that I looked both ways."

One Desmond, who at the time of the accident had been in the employ of the defendant as a street car conductor for three years and was the conductor of the car in question, testified by deposition taken by the plaintiff as follows:  " The accident occurred on Warren Street, about fifty feet before I got to Lansing Street, as my car was going out from Boston. . . . My car was on its way to Dorchester.  The accident happened as follows:  The lady that was injured was a passenger on my car.  I did not know her name at the time but shortly after I learned it was Mrs. Oddy.  It was about eight o'clock in the evening.  The first thing that happened was, I noticed what looked like a lighted lamp thrown through a window on Warren Street, then the motorman stopped the car up suddenly.  Just before the car stopped I called out Lansing Street.  Just after the car stopped a fire engine went by on my left hand side as I was facing the front of the car, that is, as I was facing toward Dorchester, and a hose carriage passed on my right hand side immediately after the engine passed.  The hose carriage I should judge was about eighteen or twenty feet behind the engine.  I stood on the rear platform looking over the gate on the left side.  I did not notice Mrs. Oddy getting off, but just after the hose carriage passed by, I saw her lying on the street right close to the step of the car, right where the hose carriage had just passed by.  To the best of my recollection her feet were toward the front end of the car and her head toward the city.

She was right near the rear step on the right hand side of the car as you faced toward Dorchester. I got down and took hold of Mrs. Oddy and lifted her up. . . . The reason I did n't see Mrs. Oddy when she got off my car is that when the fire engine passed on my left I leaned over the gate on that side of the car and looked ahead to see if the hose carriage was·coming behind it, and while I was doing that the hose carriage went by on my right, and immediately after, I saw Mrs. Oddy on the street near the step, as I have stated. . . .

" The car was stationary at the time of the accident, and the reason it was standing still was because the motorman stopped it when he saw the engine coming. The car was not supposed to stop until it got to the other side of Lansing Street, so that it was about fifty feet and the width of Lansing Street from a regular stopping place.

" I didn't ring the bell to stop, but I called out the name of Lansing Street before the car stopped; and at the time of calling out the name of that street I should judge the car was about one hundred feet from the nearest side of Lansing Street, that is, in my judgment the car went about fifty feet after I called out the name of 'Lansing Street before it stopped.

" When I called out the name of the street I opened the door of the car, and at that time I was standing on the rear platform of the car. I did nothing more than to open the door of the car and called out the name of the street and closed it again. Mrs. Oddy may have signalled to me to stop the car but I have no recollection of it. I did n't see her get off. . . . From the time the car stopped until the time of the accident, I was on the rear platform of the car on the left hand side looking over the gate, and looking forward to see if the hose carriage was coming. I expected it was coming right after the engine. The horses were right on the run on both the engine and hose carriage, — right on the gallop. They were both going as fast as the horses could run. I think they were going fast enough to go a mile in three minutes. It was directly after the hose carriage passed that I saw the woman on the ground, but the hose carriage was going very fast, and must have been two or three rods back along Warren street toward the city when I saw her."

One Bostwick, a police officer, called by the plaintiff, testi-

fied that at the time of the accident he was standing on the right hand side of Warren Street, about opposite the end of Edgewood Street, the next street before reaching Lansing.   He saw the fire apparatus coming and first noticed the car just as it was coming to a standstill.   The hose carriage came down on the side of the street next to him.   The car stopped before reaching Lansing Street, so that the rear of the car was thirty or forty feet from Lansing Street.   He saw a woman step down off the step of the rear platform, and saw her fall back; he could not tell what part of the hose carriage struck her.   She had not more than one foot on the ground ; he did not think she had both feet on the ground.   The hose wagon was going parallel to the tracks, the horse on a gallop.   The carriage came within a foot of the step.   There was an electric light at the corner of Edgewood Street on the opposite side of Warren Street.   He did not remember whether there were any lights in the stores.   On cross-examination, he testified, that he had no difficulty in seeing the fire apparatus approaching.   He saw the conductor on the rear platform.   Heard the gongs on the engine and hose cart. The latter is louder than a street car gong and of a different tone. The practice is for a street car to stop, wherever it is, when fire apparatus is approaching.   The hose carriage was a heavy one-horse four-wheeled wagon.   The horse did not strike her.   He could not tell what part of the carriage struck her.   It did not strike the car.   The fire apparatus was going as fast as you often see it.   The electric light at Edgewood Street throws light at Lansing Street.   He did not remember whether any of the stores were open.   The engine and hose carriage were making a great deal of noise.   The street is not a dark street and was not that night.   He heard them (the engine and hose cart) the minute they left Quincy Street, — the minute they left the engine-house. He heard the gongs.   They (the engine and hose cart) made considerable noise.   The horses on both pieces of apparatus were galloping.

One Fitzpatrick, called by the defendant, testified that he was the motorman on the car, and had been a motorman and driver for twenty-two years.   It was the practice always to stop cars when fire apparatus appeared.   When he saw the apparatus, it was coming down grade, the engine running on the inward car

track. The engine passed him on his left. The hose cart was approaching in the track in front of him, on which his car was running. He heard the noise of the apparatus coming, but did not remember hearing the bell on the engine nor the gong on the hose cart ; he did not take particular notice of that. The hose cart swung to its left and passed on his right, going very fast. When the car stopped, the front end was forty-five or fifty feet from Lansing Street. It was the practice for a conductor to call out the name of a street a reasonable time before reaching it. On cross-examination, he testified that the hose carriage came down the street on the track in front of him, on which his car was running, till it had to turn out. During that period it was right in front of his car, and could not be seen by any one else unless in a position to see it from the front of the car. The hose cart was running pretty nearly a mile in three minutes.

At the close of the evidence the judge was of the opinion that the plaintiffs were not entitled to recover, and directed the jury to return a verdict for the defendant, in each case, under the objection and subject to the exception of the plaintiffs, and reserved the cases for the consideration of this court under the terms and conditions of the following stipulation :

" In these cases verdicts are to be returned for the defendant by order of the court, and they are to be reported to the Supreme Judicial Court for its determination, counsel agreeing in open court that if it shall be held by the Supreme Judicial Court that the plaintiffs were entitled to go to the jury upon the evidence in the case, that judgment shall be entered for the female plaintiff in the sum of $2,400 without costs, and for the male plaintiff in the sum of $100 without costs."

*H. E. Bolles*, for the plaintiffs.

*M. F. Dickinson, Jr. & W. B. Farr*, for the defendant.

BARKER, J. These actions are on account of injuries received by a passenger as she was leaving a street car by her coming into collision with a hose cart rapidly passing in the street. The car was upon one of two parallel sets of tracks and its rear platform was furnished with gates the one on the side next the other track being closed. The car stopped to receive and deliver passengers only at designated points. After it had passed the last stopping place before that at which the passenger intended to

leave the conductor opened the door from the rear platform, put his head into the car and called out the name of the next stopping place.   The passenger thereupon gave him a signal which indicated that she wished to leave the car at the stopping place the name of which had just been called, and saw that the conductor appreciated her signal.

Presently the car slowed up and stopped.   As it was slowing up the plaintiff rose from her seat and walked to the rear door reaching the platform as the car came to a standstill and then going down the steps and placing herself in the street, either stepping into the wheel of a rapidly passing hose cart, as one eye-witness who was also a passenger upon the car testified, or being struck by the hose cart as she was leaving the car.   The car had not in fact arrived at the stopping place the name of which had been called by the conductor, nor was it in fact stopped in consequence of any order or signal given by the conductor, nor for the purpose of delivering or receiving passengers, but was stopped by the motorman because he saw approaching a fire engine and a hose cart, which were being run to a fire, and were coming toward the car at a high rate of speed in the direction opposite to that in which the car was moving.   This stoppage was in accordance with a reasonable practice, in order to avoid collisions between moving cars and fire apparatus driven at high rates of speed.   In this instance the hose cart approached upon the same tracks on which the car was.   When near the car the hose cart turned to the left and came very near the car.   The fire engine passed first, upon the other side, but with a very short interval of time.   When the car began to slow up the conductor, being on the rear platform, ascertained that the fire apparatus was approaching.   He looked over the closed gate and saw the engine pass, and he continued to look in the same direction to ascertain when the hose cart should have passed.   He did not see the passenger as she came from the car to the platform, nor until his attention was called to the other side by the passing of the hose cart when he saw her on the ground.   The passenger did not know that there was an alarm of fire, or that fire apparatus was approaching, and the jury might infer that when she rose as the car was slowing up she supposed that it was preparing to stop at the stopping place the name of which had been

called out. She testified that she heard the sound of a gong as she was getting up and walking toward the platform, but that she thought it was a car coming in the opposite direction, and that she had never before been on a car when it stopped to let fire apparatus go by. The time was eight o'clock of the evening of January 7, 1897. The passenger was fifty-two years of age and there is no contention that she was not in full possession of her mental and bodily powers.

At the close of the evidence Mr. Justice Blodgett ordered verdicts for the defendant, counsel agreeing that if this court should hold that the plaintiffs were entitled to go to the jury judgment should be entered for the passenger in the sum of $2,400 without costs, and for her husband in the sum of $100 without costs. The cases are here upon the report of the presiding justice, which purports to state all of the material testimony. The passenger herself testified that the car had come to a stop before she reached the platform ; that after she got to the platform she was giving her whole attention to getting off the car ; that she was looking right ahead and did not see anything in the street ; that she thought she took pains to find out whether anything was coming to the right or to the left on the street ; that she did not know that she looked both ways or that she turned her head, but that she could see a little to the right and a little to the left without turning her head, and that she was looking to see her way clear to get out of the car and thought it was clear. She was familiar with the street on which the car was, and had lived in the neighborhood eight years before, and she testified that the buildings on the street opposite the place of the accident were about the same at the time of the accident as eight years before. She further testified that she did not remember how dark it was, and that she did not think it was so dark that a person standing on the front of the car could not have seen an approaching hose wagon perfectly well.

We are of opinion that it would not be competent to find the defendant guilty of negligence upon the evidence. It was right for the motorman to stop the car where he did upon the approach of the fire apparatus. It is not customary or necessary to notify passengers of the cause of a stoppage occasioned by an obstruc-

tion in the street.    The conductor, while bound to give the passenger an opportunity to leave at the stopping place which she had indicated to him as the point where she wished her journey to end, was not obliged to inform her that that place had not been reached, unless he knew that she was attempting to leave under a misapprehension, and it was his duty to attend to the very things to which he was attending, namely, to ascertain when the obstruction to the progress of the car should cease by the passing of the approaching fire apparatus.

Street car companies carrying passengers in ordinary public streets or highways are not negligent in not providing means for warning passengers about to leave a car of the danger of colliding with or of being run over by other vehicles in the street.    The risk of being hurt by such vehicles is the risk of the passenger and not that of the carrier.    It is not a danger against which the carrier is bound to protect the passenger or to give him warning.

The cases relied upon by the plaintiffs are none of them cases in which the danger encountered by the passenger upon leaving a street car was merely that of collision with some vehicle not owned or controlled by the carrier and lawfully using the street. In *Bigelow* v. *West End Street Railway*, 161 Mass. 393, the danger was from an excavation or depression at the stopping place, as was the case also in *Richmond City Railway* v. *Scott*, 86 Va. 902.    *Floytrup* v. *Boston & Maine Railroad*, 163 Mass. 152, was the case of a passenger upon a steam railroad having its own roadbed and passenger stations, and so was *Treat* v. *Boston & Lowell Railroad*, 131 Mass. 371.    In *Fleck* v. *Union Railway*, 134 Mass. 480, the passenger was jolted and thrown off from a slippery platform.    *Carland* v. *Young*, 119 Mass. 150, and *Murphy* v. *Armstrong Transfer Co.* 167 Mass. 199, were the usual cases of foot travellers crossing streets upon which ordinary teams were approaching, the foot traveller being struck after he had gone some distance, and not stepping into the wheel from the curbing or colliding with the vehicle before he had both feet in the street.

In *Maverick* v. *Eighth Avenue Railroad*, 36 N. Y. 378, the passenger struck by a ladder on a hook and ladder carriage running to a fire was still upon the platform of the street car, and was

being hurried from the car by the conductor with his hands upon her shoulders.    See *Chicago West Division Railway* v. *Mills*, 91 Ill. 39, 42, where it is said that " Passengers, as a matter of prudence, before attempting to get off, should know that the stoppage was for the purpose of letting them get off."    See also *Augusta Railway* v. *Glover*, 92 Ga. 132, 147, for a statement that " no duty touching the selection of a safe place for landing passengers is operative on any stop made on account of an obstruction upon the track."

<em>Judgments for the defendant on the verdicts.</em>